## CHARLESTON.

RICKARD & WELSHAUS *et al. v.* SCHLEY *et al.*

Submitted February 3, 1886.—Decided February 13, 1886.

1. Under secs. 1 and 2 of ch. 139 of the Code of West Virginia a decree against a general receiver of the court requiring him to pay out of funds then in the hands of the general receiver to a party to the cause, in which the decree is rendered, a certain sum on a named future day has the effect of a judgment for such sum of money with interest from the day, on which it is to be paid, with a stay of execution till that day, and is a lien on the lands of such general receiver, and the person entitled to the benefit of such decree or order is to be deemed a judgment-creditor and may enforce his lien as other judgment-creditors by a suit in equity.

2. Said sections so construed are constitutional.

*I. Fouke* and *F. W. Brown* for appellants.

*G. Baylor* for appellees.

Statement by GREEN, JUDGE:

John L. Rickard and John F. Welshaus, late partners under the name style and firm of Rickard & Welshaus, M. S. Ken-

dal and Daniel T. Knode on behalf of themselves and all other lien-creditors of the defendant, John E. Schley, at July rules, 1881, filed their bill in chancery in the circuit court of Jefferson county against John E. Schley and twenty six other defendants. The bill alleged that the plaintiff Knode among others recovered in said court on November 29, 1872, in *Glenn, &c.* v. *Blackford, &c.* a decree against John E. Schley as general receiver of said court for $24.03 and also on April 27, 1876, in said cause and two others, named, $11.72, and that the plaintiff, Kendal, in said last decree recovered against him $67.06; and in the same decree many other persons recovered various sums against him as such general receiver. Certified copies of so much of these decrees as show these orders in favor of these plaintiffs are filed as exhibits. The first is a decree, that John E. Schley, a general receiver of this court, do pay on January 1, 1873, to D. T. Knode $24.03. The second is a decree that John E. Schley, late receiver of this court, out of the funds in his hands pay to M. S. Kendal $67.06 and to David T. Knode $11.72. The last decree is dated April 27, 1876. The bill then states that Rickard & Welshaus on April 10, 1879, recovered against John E. Schley individually a judgment in said court for $285.45 with interest from March 25, 1879 till paid and $18.50 cost, on which judgment an execution issued and was returned "no property found," and that the Jefferson Savings Bank recovered in said court two judgments, describing them, against said Schley and said Rickard & Welshaus, his surety, which the plaintiffs, Rickard & Welshaus, were compelled to pay for said Schley; that said Schley is possessed of certain real estate in said county on the Kearneysville turnpike and within half a mile of Shepherdstown being a highly improved farm containing 356 acres, on which said judgments are liens. The bill then concludes thus:

"In consideration whereof, forasmuch as your orators are remediless in the premises save by aid of a court of equity, they pray that the rents and profits of said real estate may be sequestered and a receiver appointed for the same; that the value and annual rental value of the said real estate of the defendant John E. Schley, with the amount of liens thereon and their respective priorities, may be ascertained and that a

decree may be rendered for a sale of said real estate, or so much thereof as may be necessary to pay and satisfy said liens thereon, and for such further and general relief as may be consistent with equity and the case requires, and that they will ever pray, &c."

It will be observed, that the relation of these twenty-six defendants other than Schley to the purposes and objects of this bill is not stated; and we can only guess at that relation by supposing that some of them are judgment-creditors of Schley and others deed of trust creditors and others trustees in deeds of trust given by Schley, as they are called trustees. But this is of course a mere surmise, and their relations to the cause might be very different from this surmise.

This bill was demurred to by Schley; and on March 27, 1882, the demurrer was sustained by William H. Travers sitting as special judge. The ground, on which the demurrer was sustained, as stated in the decree sustaining it, was that there was a misjoinder of parties plaintiff, the bill showing that Kendal & Knode had only decrees against Schley as receiver or as late receiver, and these decrees, the court was of opinion, were not liens on the lands of Schley. Leave was given the plaintiffs to amend their bill. The bill was accordingly amended; and Kendal & Knode left out of the amended bill as plaintiffs, the only plaintiffs in it being Rickard & Welshaus; but Schley and the same twenty-six others were made defendants. The amended bill alleged the same facts as the original bill omitting the statement about the decrees against Schley as receiver, but avoided an obvious defect in the original bill by showing the relation of each of these twenty-six defendants to the cause stating that they were judgment-creditors, or had liens on said tract of land by deeds of trust, or were trustees in these deeds of trust. This amended bill sets out in detail these various judgments and deeds of trust, and concludes by asking, "that the rents and profits of said real estate may be sequestered, and a receiver be appointed for that purpose; that the value and annual rental value of the said real estate of the defendant John E. Schley, and which is all the real estate said Schley owns or is possessed of in this county and State, with the amount and character of the liens thereon and their respective priorities, may be ascer-

tained; and that a decree may be rendered for a sale of said real estate for the payment and satisfaction of your orators' said liens and the other liens thereon, and for such further and general relief as may be consistent with equity and the case requires."

Another amended bill was filed simply giving the names of the members of a firm made parties-defendants by the bill and the names of the administrators of one of the defendants, who had died; and it asks that these parties may be made defendants. Demurrers by Schley to these amended bills were overruled.

On May 29, 1883, this cause was by a decree referred to Forrest W. Brown, a commissioner in chancery, with instructions to ascertain and report, first, the real estate of which the defendant John E. Schley is seized and possessed; second, the value and annual rental value of said real estate; third, to audit all the liens on said real estate, stating their character and respective priorities. Under this decree a report was made by the commissioner which by a decree of November 29, 1884, was recommitted to him without the court's taking any action upon it and with instructions to execute the above decree. And on February 9, 1885, the commissioner having proceeded in all respects properly to execute the duty imposed on him returned his report. I give below the conclusion of this report adding to it simply the dates when the liens of each of the lienors were docketed. These dates are taken from portions of the report, which I have not deemed it necessary to state.

| | | "RECAPITULATION. | Costs. | Prin'pal. | Interest. |
|---|---|---|---|---|---|
| Jan. 2, 1868. | Class 1. | Billmyer and Miller, use Muzzey. | ...... | $122.00 | $33.51 |
| April 30, 1872. | " 2. | Same, trust to H. H. Blackburn, same use.. .................. ........ ..... | $15.80 | 495.14 | 214.23 |
| Feb. 27, 1877. | " 3 | F. W. Muzzey, assignee of the Farmers' and Mechanics' National Bank........................... . | .......... | 5,000.00 | 760.00 |
| | " " | Same, assignee Central Nat. Bank, Frederick. ....... ..................... | .......... | 5,000.00 | 760.00 |
| Sept. 29, 1877. | " 4. | W. W. Taylor, trust, Flick. trustee | .......... | 3,600.00 | 1,665.60 |
| Sept. 12, 1877. | " 5. | T. Homsher, trust, Thos Turner, assignee .................................. . | 4.80 | 26.00 | 11.45 |
| Oct. 5, 1877. | " 6. | Jefferson Savings Bank (use Muzzey)................................. ........... . | 4.45 | 57.83 | 25.25 |
| Dec. 17, 1877. | " 7. | T. Homsher, Sav. Bank, Thomas Turner, Judgment,................... | 11.05 | 176.09 | 78 18 |
| Jan. 1, 1878. | " 8. | A. R. McQuilkin, Judgment........ | 17.40 | 804.68 | 343.44 |
| Jan. 10, 1878. | " 9. | Berkeley Sav. Bank, use Logie, Judgment ............................... | | 108.08 | 45.49 |
| | " " | Jeff. Savings Bank, use Muzzey.... | 10.70 | 185.11 | 77.53 |
| Dec. 31, 1878 | " 9½ | Jacob H. Miller, use Muzzey......... | 1.00 | 794.20 | 288.95 |
| March 6, 1879. | " 10. | Joseph Randall.. ........................... | 9.55 | 452.14 | 159.00 |
| March 25, 1879. | " 11. | Rickard & Welshans, use Muzzey | 17.50 | 285.45 | 99.52 |
| April 14, 1879. | " 12. | John W. Langley........................... | 10.55 | 310.08 | 107.00 |
| April 8, 1880. | " 13. | Clark & Coover........................... | 10.60 | 225.20 | 64.47 |
| July 9, 1880. | " 14. | J. B. Thomas, use Muzzey........... | 8.91 | 208.63 | 56.53 |
| Nov. 20, 1881. | " 15. | M. M. Rohrback, use Muzzey........ | 5.50 | 94.56 | 28.84 |
| April 30, 1883. | " 16. | D. W. Border, use Muzzey.............. | 3.21 | 128.08 | 13.16 |
| | | | $131.02 | $18,073.27 | $4,830.15 |

Total amount, principal and interest with interest on $18,034.27, part
   thereof, from January 16, 1885, until paid.......................................... ... $23,034.44

The only exception taken to this report was the one taken
by Isaac Fouke and the other creditors, in whose favor there
were sums decreed to be paid in said decree of April 29, 1876,
a copy of which was returned with said report. That decree
was rendered by the circuit court of Jefferson on April 24,
1876, in four causes heard together, which causes are put be-
low at the head of said decree which was as follows:

"James W. Grantham and others, Plaintiffs,
            Against           } In Chancery.
"Henry Blackford and others, Defendants,

"Henry Blackford and others, Plaintiffs
            Against           } In Chancery.
"Martin Grove and others, Defendants,

"Evelina Moler, Plaintiff,
            Against           } In Chancery.
"Fouke and Blackburn, Sp'l Com'rs, Def'ts.

"These causes coming on again to be heard together upon the papers formerly read in the cause, and upon the recommitted report of Commissioner Cleon Moore, of date April 24, 1876, returned and filed April 25, 1876; and there being no exceptions to said report, the same is approved and confirmed; and it appearing from said report that the amount in the hands of John E. Schley, late receiver, of the funds in these causes on August 1, 1876, will be the sum of $3,691.65, it is adjudged, ordered and decreed that the said John E. Schley do retain the sum of $73.82 for his commissions as receiver, and that he do out of the sum of $222.80 retained for that purpose, pay any costs taxed by the clerk which have not heretofore been paid, to those interested in the same, as ordered by previous decree in the cause and to Cleon Moore, commissioner, the sum of $35.00 for his report, and to Isaac Fouke the sum of $75.00 for his fee in collecting the debt against W. G. Butler, &c., and that then on August 1, 1876, he do pay to the several paternal heirs of Wm. Grove, deceased, or their attorneys acting under power of attorney, the several sums severally appropriated to them."

Then follows in said decree the names of upwards of 200 persons, to whom were apportioned severally the sums named in connection with each name severally. These sums varied from ninety-four cents to $469.26. This decree concludes as follows:

"And it is further adjudged, ordered and decreed that in case of the death of any of the persons before receiving the amounts herein decreed them the said John E. Schley shall and he is hereby ordered to make payments to the legal representatives of such persons or their attorneys acting under power of attorney in the same manner as if the persons were living to receive the same, and it appearing from a former report in the cause, and by the decree rendered on the —— day of November, 1872, that James W. Glenn administrator of Wm. Grove, deceased, holds the several refunding bonds of Catherine Knode, William Blackfoot and Helen Douglass each for a larger amount than the sums herein severally decreed said several parties; it is hereby adjudged, ordered and decreed that John E. Schley the late receiver do pay to the said James W. Glenn the several amounts herein

severally decreed said Catharine Knode, Wm. Blackford and Helen Douglass, same to be credited by said James W. Glenn on the said several refunding bonds.   And it being suggested to the court that certain other funds in addition to those hereinbefore distributed in the hands of the late general, receiver John E. Schley, due distributees in these causes directed to be paid under a former decree of distribution, have not yet been so paid by said receiver, to the parties entitled thereto, by reason of errors in the names of certain distributees as reported and because a detailed statement of the names of all distributees entitled, were not then reported and stated in the decree.   And it now appearing that said errors in names have been corrected, and a detailed statement of the distributees has been made in said report of commissioner Cleon Moore, it is adjudged, ordered and decreed that John E. Schley, receiver, do forthwith distribute and pay said sums heretofore ordered to be paid respectively to the parties entitled thereto, in accordance with the corrected names and detailed statement of distributees ascertained and reported in said Cleon Moore's report, and hereinbefore stated in decree."

The exceptions of Isaac Fouke and the other creditors named in this decree were not filed in the commissioner's office but were filed at the June term of the circuit court of Jefferson county before the hearing of the cause, which was on June 10, 1885.   This decree was rendered by A. E. Kenedy special judge, who had been duly elected and qualified, and was as follows :

"This cause came on again on June 10, 1885, upon the papers formerly read, and the report of commissioner Forrest W. Brown returned and filed in the cause on February 9, 1885, the exceptions to said report endorsed thereon in court by Isaac Fouke and was argued by counsel ; on consideration whereof the court is of opinion to overrule said exception, and doth confirm said report in omnibus. And it appearing from said commissioner's report that the real estate of which the defendant John E. Schley is seized consists of 357 acres of land valued at $55.00 per acre, equal to $19,635.00, and the rental value thereof is $900.00 per annum, and that the liens binding upon said real estate amount in the aggregate to

$23,034.44, including interest to January 16, 1885, and costs and that therefore a sale of said realty to satisfy said liens will be necessary, the court doth adjudge, order and decree that unless the said John E. Schley or some one for him shall within sixty days from the date of this decree pay to the several parties entitled or in the hands of the general receiver of the court, the amount of the debts so audited as liens upon his land as aforesaid." ·

Then follows the appointment of commissioners of sale, who are in the usual and proper mode directed to sell said land of John E. Schley. From this decree and the decree of March 27, 1882, sustaining the demurrer to the original bill Isaac Fouke and most of the parties, to whom sums were decreed in the above decree against Schley, receiver, obtained an appeal to the first of said decrees and an appeal and *supersedeas* to the last.

Opinion by GREEN, JUDGE:

The first question presented by this record is: Is the decree of the circuit court of Jefferson of April 29, 1876, against John E. Schley, the then late receiver of the circuit court of Jefferson, in favor of more than two hundred persons severally for various sums of money from ninety-four cents to $469.26 to be paid at a future day, August 1, 1876, a lien on the lands of said John E. Schley then owned by him? The circuit court of Jefferson was of opinion, that it was not, and therefore on demurrer by Schley to the original bill, which was a creditor's bill, to subject the lands of Schley to sale to satisfy the judgment-liens and other liens upon them, the court sustained the demurrer, because two of the plaintiffs in the bill were parties who had only this decree in their favor against Schley as general receiver, and they were united as plaintiffs with parties who were judgment-creditors against Schley individually. This the circuit court regarded as a misjoinder of plaintiffs, these two plaintiffs, who had only this decree against Schley as receiver, being regarded by the court as thereby acquiring no lien on the lands of Schley.

Originally no decree of a court of chancery of any kind was a lien upon the lands of the defendant debtor nor could

it be made so by issuing an *elegit* to enforce the payment of
the sum decreed; for no execution of any sort could be
issued on a decree of a chancery court.   Decrees were
enforced by the chancery court awarding against the defend-
ants, against whom the decrees were, an attachment, his fail-
ure to pay the debt decreed to be paid, being regarded as a
contempt of the court.   If, when the attachment issued, the
debtor defendant could not be found, the chancery court
issued an attachment with proclamations, and if this was
also returned, not found, a commission of rebellion was issued
by the chancery court, or a writ of sequestration, first *nisi*
and then absolute, might be issued after an attachment in
the proclamation, or a commission of rebellion had issued.
(*Hook* v. *Ross*, 1 H. & M.. 310).

But at a very early day it seemed to the Legislature of
Virginia to be right, not only that courts of equity should
have the power of carrying their decrees into execution, but
that such execution ought to be had by the most direct, sim-
ple and efficacious means.   As early as 1787 an act was
passed, that after a final decree of a court of chancery for
lands, slaves, money or things of a specific nature the par-
ties obtaining such decree might issue any appropriate writ
of execution thereon, a *fi. fa.*, *ca. sa.*, *elegit*, or any other writ,
which could be issued on a like judgment in a common law
court.   And by an act passed January 23, 1798, like writs
of execution in like cases might be issued on interlocutory
decrees.   This law was greatly changed in the code, 1849,
by the provisions to be found in Tittle 53, ch. 186 to 189
inclusive.   Chapter 189, secs. 1 and 2 were as follows (page
708 of Code of 1849):

" 1.  A decree for land or specific personal property and a
decree or order requiring the payment of money, shall have
the effect of a judgment for such land property or money
and be embraced by the word ' judgment' when used in any
chapter under this title.   But a party may proceed to carry
into execution a decree or order in chancery other than for
the payment of money, as he might have done if this and
the following sections had not been enacted.

" 2.  The persons entitled to the benefit of any decree or
order requiring the payment of money shall be deemed

judgment creditors, though the money be required to be paid into a court, or a bank, or other place of deposit. In such case, an execution on the decree or order shall make such recital thereof, and of the parties to it, as may be necessary to designate the case; and if a time be specified in the decree or order, within which the payment is to be made, the execution shall not issue until the expiration of that time."

The sixth section of said ch. 186 of Code of 1849, p. 709 provided that " every judgment for money rendered in this State heretofore or hereafter shall be a lien on all the real estate of or to which such person shall be possessed or entitled at or after the date of such judgment or if it was rendered in court at or after the commencement of the term at which it was rendered " with an exception in reference to judgments rendered prior to July 1, 1850, when this Code went into effect.

These provisions of the Code of Virginia of 1849 have ever since been in force both in Virginia and West Virginia (Code of W. Va. ch. 139, secs. 1, 2 and 5, Warth's Code pp. 772–773). Of course since this statute-law went into effect a decree of a chancery court against a party personally has been a lien on his lands, just as the judgments of a common law court against him personally are a lien on his land. But whether a decree or order requiring the payment of money by a commissioner of sale or by a receiver general or special out of funds in his hands, whether such payment is required to be made immediately or at a certain fixed period in the future, is to have the effect of a judgment and be a lien on the lands of such commissioner of sale or general or special receiver has never been decided in this State, though it has been decided in Virginia under the same statute-law, that a decree entered directing a commissioner of sale out of funds reported in his hands to pay certain creditors named has under said secs. 1 and 2 the effect of a judgment and is a lien on the lands of such commissioner of sale (*Lee* v. *Simpson*, 76 Va. 173). The reasoning, by which this conclusion was reached, would necessarily give to a decree or order directing a receiver to pay money reported to be in his hands to certain creditors the effect of a judgment and make it a lien on all the lands of such general receiver. The follow-

ing is the reasoning of Judge Staples, who delivered the unanimous opinion of the court in that case:

"The contention is that the decree against Sydnor as commissioner, requiring the money to be paid by him out of the funds in his hands, imposes no personal liability, and does not constitute a lien on the real estate of the said Sydnor. We think the word 'commissioner' upon familiar principles, does not give character to the decree, and may be rejected as surplusage. The directions to pay the money 'out of the funds reported in his haads' was not intended to restrict the personal liabilities of the defendant, but was a mere statement or recital of the reason or grounds upon which the court proceeded in entering up the decree at that time. It was so understood by the parties interested, for immediately upon the adjournment of the court they proceeded to have the decree regularly docketed, and it certainly was so understood by the court itself. We need not however trouble ourselves to discuss this point, as every difficulty on the subject is removed by the provisions of our statutes. Secs. 1 and 2 of ch. 18, Code of 1873, declare that a decree or order requiring the payment of money shall have the effect of a judgment for such money and be embraced by the parol 'judgment' where used in any chapter under that title. The persons entitled to the benefit of such decree or order for the payment of money shall be deemed judgment creditors, although the money be required to be paid into court, or a bank, or other place of deposit, and may be enforced by execution. Sec. 6 declares every judgment for money rendered in this State, theretofore or thereafter rendered, shall be a lien on all real estate from or to which such person shall be possessed or entitled at or after the date of such judgments. We are of opinion that under the operation of these provisions it is very clear that the decree of May, 1875, constituted a valid lien upon the lands of Sydnor."

It is apparent from this, that the Virginia court of appeals thought, that entirely independently of these sections 1 and 2, which are also in force in this State, a decree, that Alexander Sydnor, commissioner, out of the funds reported in his hands do pay a certain sum to a certain person was a per-

sonal decree against him, on which executions could have issued prior to the passage of these sections 1 and 2, that is, prior to July 1, 1850; and that prior to that time they would therefore have been liens on his lands.   It does seem to me, that the first part of this opinion of Judge Staples intended to establish this position as unsatisfactory.   Prior to July 1, 1850, when these sections 1 and 2 went into effect as law, I can not think, that a direction given by a court to one of its own officers, whether he were a special commissioner of sale, a general receiver or a special receiver, to pay out or distribute a fund in the hands of such officer among parties, whom the court adjudged entitled to the fund, would be considered a personal decree against the person, who happened to hold the office and the fund disposed of by such decree, or that any execution on such an order could have been issued, or that such order was a lien on the lands of such person.

It is not necessary to discuss this question in this case; but I will refer to a few Virginia cases decided prior to 1850, which, I think, when duly considered will show, that this reasoning and conclusion of Judge Staples can not be sustained ( *Endors* v. *Board of Public Works et al.* and *Same* v. *Robinson et al.*, 1 Gratt. 364; *Gibson* v. *White & Company*, 3 Munf. 98 ).   These causes appear to go even further than was necessary to go in order to reach the conclusion, that prior to July 1, 1850, a decree to pay money out of a particular fund in an officer's hands was not a personal decree; for though rendered against one, who was not an officer of the court, these causes seem to hold that such a decree could not be enforced by execution and therefore did not create a lien on the defendants' property.   But it seems to me that this was all changed by sections 1 and 2 of ch. 186 of the Code of Virginia, p. 708 quoted above and which are the first and second sections of ch. 139 of Code of W. Va., ( Warth's code p. 772 ) which obviously made .many kinds of orders and decrees of a chancery court the equivalent of common law judgments and capable of being enforced in like manner, which no one would have considered as decrees, on which execution could issue, or which created liens on the debtor's land prior to that time.   No one for instance would have regarded money required to be paid into court .by a

party as a decree, on which an execution could issue and as the equivalent of a common law judgment. So a decree requiring money to be paid into bank or any other place of deposit by a party could not prior to that time have been reguarded as a decree, on which execution could issue. So too most obviously if a decree required money to be paid by a party at some future time, no execution could have been issued on it, even though the time had expired, and the money was not paid. In all such cases, if the party failed to obey the order of the court and pay the money into court or into bank or other place of deposit, or if after the lapse of the time, within which a party was required to pay money to another, it was shown, that he had not done so, or if in any of these cases it was shown, that the party had not obeyed the order of the court, the court could have rendered a personal decree against him for the immediate payment of the money due to the party entitled thereto, and upon this decree an execution could issue, and this decree created a lien on the delinquent party's land. But no execution could issue and no lien was created by the first order.

All this is expressly changed by this second section above quoted; and after it went into effect on July 1, 1850, an execution could issue on any such orders, and being regarded by the express provisions of said 1st and 2nd sections as having the effect of judgments they of course created a lien on the lands of the party ordered to pay the money into court or into bank or to some other party at a future time. If then the legislature thought proper to make so great a revolution in our law on this subject, I can see no sound reason, why we should exclude from its operations orders or decrees on officers of the court having funds in their hands, the words of these sections being broad enough to include them. It is true, that such orders had never been regarded as the equivalent of judgments, on which an execution would issue; but it is also true, as we have seen, that many of the other orders made the equivalent of judgments were never so regarded before, though made or parties to the cause. To my mind it is obvious, that the legislature in enacting these first and second sections designedly used language broad enough to cover orders on officers of the court to pay out

moneys in their hands and make such orders thereafter operate as judgments. For the orders expressly declared as in effect judgments, on which executions would issue, were most of them very rarely if ever made against parties to the cause, but were constantly made against officers of the court, such, for instance, as orders to pay money into court or orders to pay money into a particular bank or orders to pay money out to parties at some future period. These were all declared judgments in effect, yet, it seems to me, they were frequently made against officers of the court and some of them rarely if ever against other persons. Officers of the court were included in the language used in secs. 1 and 2; and, I think, they were intentionally so included. I concur therefore with the Virginia court of appeals in holding, that orders against officers to pay out of moneys in their hands certain sums to certain parties have the effect of judgments and can be enforced by executions and are liens on the lands owned by such officers. It is obvious that this will be so, though such sums are to be paid by such officers out of funds in their hands at some fixed future period. The second section above quoted expressly providing for such cases : " The execution shall not issue till the expiration of that time." Such an order on an officer of the court to pay money to certain persons at a fixed future time out of funds in his hands, when the order is made, is under our statute-law in its effect equivalent to a judgment with a stay of execution till such fixed future day.

This is exactly the character of the decree aforesaid of April 27, 1876. The report of the commissioner, on which this decree was based, distinctly shows, that the funds decreed to be paid were then in the hands of John E. Schley, the late receiver of the court, and the calculation of interest was made to August 15, 1876, for convenience only, but though this report is copied into the record, it constitutes no part of it, and we can not look at it, as it was obviously not before the court below, when it acted in this cause. But on the face of said decree of April 27, 1876, it sufficiently appears, that the funds decreed to be paid out on August 1, 1876, were then in the hands of John E. Schley and were not funds to be by him thereafter received. The following are the words of the

decree : " It appearing from the said report of Cleon Moore, that the amount in the hands of John E. Schley late receiver of the funds in these causes on August 1, 1876, will be the sum of $3,691.65, it is decreed," &c.   Now as from this it appears, that Schley was no longer the receiver in these causes but was *late* receiver, it necessarily follows, that he had then no authority to receive any funds in these causes, and therefore no part of this $3,691.65 could have been received after the first day of August.   When then the decree recites that the sum, which as late receiver he will have in his hands on August 1, 1876, would be $3,691.65, it must be interpreted as meaning, that the sum in his hands at the date of the decree will on August 1, 1876, amount to $3,691.65 ; and in fact the decree really says that the funds were then, when the decree was rendered, in hand, for it says " the amount in the hands of John E. Schley late .receiver will be on August 1, 1876, &c."   This I understand asserts that the amount which will be on August 1, 1876, a specified sum is now in the hands of Schley late receiver.  So.interpreting this decree it is in effect a judgment for the several amounts decreed to be paid to the several parties with a stay of execution till August 1, 1876. I am not prepared to say that under our statutes this decree would not be the same in effect, though the sum decreed was to be collected afterwards by the receiver ; but I express no opinion on that question, as it does not arise in this case.

But it is insisted by the appellees' counsel, that if this be the true interpretation of secs. 1 and 2 of ch. 139 of the Code, then these sections are unconstitutional, as they violate the Fourteenth Amendment of the Constitution of the United States, which provides : " No State shall deprive any person of life liberty or property without due process of law ;" that as the receiver or commissioner of sale or other officer of the court is no party to the cause, in which he holds funds, he can not be bound by any decree ordering him to pay out funds in his hands ; and that if such decrees or orders are to be regarded as judgments and enforced by the sale of the officer's property real or personal, then he will be deprived of his property without due process of law.

Now I do not by due process of law when applied to suits understand, that no person can be deprived of

his property unless he be a formal party to some suit. It means due course of legal proceedings according to those rules and forms, which have been established for the protection of private rights. No decree or judgment can be rendered in any judicial proceeding, if conducted according to due process of law, unless the court proceeds upon enquiry and renders its decree only after a trial. The court must hear, before it condemns. It is obviously not essential to the validity of a decree, that in every case the person, against whom a decree is rendered, should be a party to the cause. The appellee's counsel admits, that an officer of the court as a commissioner of sale or a receiver may have a decree rendered against him, though he is never a party to the cause, provided a rule has been served on him to show cause, why a decree should not be rendered against him for failing to pay funds in his hands to the parties entitled to such funds. But if he have the opportunity of being heard as to the amount of the funds in his hands subject to the order of the court, I can not see, after this has been ascertained by proper legal proceedings or as we may say by due process of law, why, if the legislature think proper, it may not say that an order of the court directing him to pay this fund thus ascertained to be in his hands shall be a lien on his lands and may be enforced by execution. After the fund has by due process of law been proved to be in his hands, it may be ordered to be paid out to the proper parties, and this order may be enforced, as any judgment is enforced, if the legislature choose to so provide. There is in this no violation of any rules or forms, which have been established for the protection of private property, no condemning before one is heard. The action of the court is taken only after enquiry; and the decree is rendered only after an opportunity for controverting its propriety has been afforded to the officer of the court. Such orders directing officers of the court to pay out funds in their hands to parties ascertained to be entitled to them are not made without first a proper ascertainment of what funds are in the hands of the officer. This is ascertained most generally from a report made by himself to the court, sometimes by the report of a commissioner, before whom he always has the opportunity of appearing. In this particular case it appears by the decree to

have been ascertained from the report of commissioner Cleon Moore, to which there was no exception, and of course in the absence of all proof to the contrary we must assume, that not only John E. Schley, the receiver, but every other person having an interest in said report was duly notified, that the matters contained in the report were being enquired into by the commissioner by order of the court. It seems to me idle to claim, that in this case the ascertainment of the amount in the hands of Schley the receiver in the cause, in which this decree of distribution was made, was not in accordance with due process of law; and if the amount was ascertained by due process of law, it may be ordered to be paid out, and this order may be enforced as other judgments are, if the legislature has thought proper so to provide, and it seems that they have.

The circuit court ought not to have sustained the demurrer to the original bill in this cause, as it did, because there was a misjoinder of plaintiffs in the bill; for on its face it showed, that all the plaintiffs had judgment-liens on the lands arising from common law judgments or decrees, which the statute-law provided should have the effect of judgments. But this demurrer ought to have been sustained on another ground. For though the bill on its face shows, that the plaintiffs knew, that there were many liens on the land of the defendant, Schley, both by deeds of trust and judgments, yet they made no one but Schley a defendant in any proper manner instead of making all the lienors other than those, who were plaintiffs, defendants properly, as they should have done. It is true process issued against twenty-six others besides Schley as defendants in this cause, and they are so called in the bill, but not a word is said about them in the bill, and we cannot learn from it, why these twenty-six persons were called defendants and summoned more than any other twenty-six persons having no connection with the cause. The court might properly for this reason have sustained the demurrer to the original bill and have given leave to file an amended bill. (See *Moseley* v. *Cocke,* 7 Leigh 224). The amended bill corrected this error and showed the interest of these twenty-six defendants in the cause as parties having liens upon the land asked to be sold or as trustees

in deeds creating such liens. And though two of the plaintiffs under the erroneous opinion of the court expressed in the decree sustaining the demurrer were unnecessarily left out in the amended bill as plaintiffs, yet no injury resulted, as they afterwards became parties to the cause by presenting the decree, under which they claimed to be judgment-creditors, to the commissioner, when under the order of the court he was auditing the liens on the land of the defendant Schley.

It is claimed that these parties never did become parties to this cause, nor were any of the appellants, because the commissioner's report does not show, that this decree of April 27, 1879, of the circuit court of Jefferson was presented to him, while he was auditing the liens against the land of Schley. This claim of the appellent's counsel is based on the indefinite character of the statement of the commissioner in his report in reference to this decree. He says a decree against John E. Schley as general receiver has been presented to your commissioner, but has not been audited, as the commissioner does not consider it a lien upon the real estate of John E. Schley. This certainly would be so vague, that no one could thereby be regarded as made a party to the cause. But the commissioner adds: "A copy of this decree is herewith returned" and a copy of the decree of April 27, 1876, against John E. Schley is in the record and must be regarded as returned with this report, as the copy of no other decree is in the record. This makes this vague statement of the commissioner in his report perfectly definite and all the appellants parties to this cause.

Ought the court to have sustained the exception filed by Isaac Fouke for himself and other judgment-creditors named in said decree, because the commissioner refused to audit the same? It is insisted by the counsel for the appellee, that this exception ought to have been overruled, because it was not filed, while the report was before the commissioner, and not until it had been returned to the court. The law on this subject is well settled. By the acts of 1882, page 108 § 7 ( Warth's Code ch. 129, § 7 page 718 ) the commissioner is required, after his report is complete, to retain it ten days in his office for exceptions; and if exceptions are filed, while the report is in his office, the commissioner must return the

exceptions with the report and the evidence relating thereto
and any remarks therein, which he deems pertinent.   But a
party may, if he chooses, except to the report at the first term
after it is returned, as was done in this case.    It is obvious
therefore, that, unless there be exceptions filed, while the re-
port is in the commissioner's office, it is not his duty to re-
turn the evidence, on which it is based, and therefore the
court cannot regard any exception filed in court, as was the
case with the exception we are now considering, if the ex-
ception be of such a character as might be affected by extra-
neous evidence.    But if the report be erroneous on its face,
or if from any written document referred to in the report
and returned with it and thus constituting a part of the re-
port it appears to be erroneous, it may be objected to at the
hearing, though no exception was filed, while the cause was
before the commissioner.    And even if no exception be filed
at the hearing in the court below, such objection may be
made in the appellate court, provided always it is apparent,
that the objection is of such a character, that the evidence
taken before the commissioner and not returned with his
report could not have removed the objection ( *Hyman, Moses
& Co.* v. *Smith et al.*, 10 W. Va. 298, point 4 of syl. ;    *Ogle* v.
*Adams*, 12 W. Va. 215, point 7 of syl.; *Thompson's Adm'r* v.
*Catlett*, 24 W. Va. 524, points 5, 6, 7 of syl. ;    *Evans* v. *Shro-
ger*, 22 W. Va. 581, point 2 of syl.

In the case before us the court, before it referred the cause
to the commissioner, had decided, that this decree of April
27, 1876, ordering John E. Schley to pay to the appellants
severally various sums of money gave them no lien on the
real estate of said Schley.    This was done when the demur-
rer to the bill was sustained.   As a matter of course there-
fore the commissioner in auditing the liens had  to refuse to
audit any liens in favor of the appellants based on this de-
cree, as he states in his report he did ; and of course any
evidence relative to the amount of these rejected claims or
any evidence in reference to their payment would have been
entirely irrelevant to the matter referred to the commissioner
to ascertain; and this report on its face shows, that these
liens claimed by the appellants by virtue of this decree were
rejected, because they never were liens and for no other rea-

son. As we have reached the conclusion, that they were liens, even had no exceptions been filed in the court below, we would reverse the decree affirming such commissioner's report, it being erroneous on its face in a matter, which could not have been affected by extrinsic evidence.

But in the exception filed by Isaac Fouke and the other parties, to whom Schley was by this decree ordered to pay money, they insist that the commissioner erred not only in not auditing their claims as liens but also in not including them in class No. 2. This class consisted of Frank W. Muzzey alone; and his claim to be a lienor on this farm of Schley was, that Schley had executed to H. H. Blackburn, trustee, on April 30, 1872, on which day it was duly recorded, a deed of trust on this farm to indemnify Bylmyer & Miller, his sureties upon a receiver's bond, in the penalty of $25,-000.00; and they had been compelled as his sureties to pay a judgment against Schley as receiver, which with interest and costs amounted, when the commissioner's report was made, to $725.17; and that their right and claim to demand the re-payment of this by Schley had been assigned to him, Muzzey. The appellants claim, that said Bylmyer & Miller were also sureties for Schley, general receiver, for his default in not paying to them the various sums decreed them by the said decree of April 27, 1876; and that Bylmyer & Miller were also indemnified against any loss as sureties of Schley by reason of this decree of August 27, 1876, by said deed of trust given by Schley dated April 30, 1872; and as it appears, that Schley is insolvent, and that for the various sums decreed against him in favor of the appellants said securities are now responsible with no hope of the same ever being paid by their principal, the appellants have the same right to have these sums paid, as the said Bylmyer & Miller, and by substitution and in the same order, that is, as lienors of date April 30, 1872; and that therefore all the claims of the appellants should have been audited in class No. 2.

It is highly probable, that in point of fact this claim of the appellants is just; but that is a mere surmise. It is obviously a claim, which might have been affected by extrinsic evidence taken before the commissioner and not returned with his report. We only know from said decree of April 27, 1876,

that Schley was not then receiver; but, for all we know, it might have been proven before the commissioner, that he was receiver in 1873 and gave a new bond with different securities, as the law required him to give a new bond each year, (Code, ch. 133, § 20); and that his sureties in this new bond and not Billmyer & Miller are the parties really responsible for the default of Schley as general receiver in not paying the various sums decreed by the decree of April 27, 1876. If the appellants had claimed to have their lien audited as of date April 30, 1872, and not as of 1876, when they got their decree, they should have filed their exception to not being audited in this second class, while the cause was before the commissioner, and have had him send up all the evidence, which was before him as commissioner, bearing on the question, whether Billmyer and Miller as the sureties of Schley, general receiver, were responsible for the various sums decreed to the appellants in the decree of April 27, 1876. As it is, we must hold, that they were not entitled to be put as lienors in this second class. But as the third class is a debt of $5,760.00 in favor of Frank W. Muzzey by reason of a deed of trust given by said John E. Schley on said farm dated February 27, 1877, it is obvious that the claims of the appellants under the decree of April 27, 1876, against Schley must come in before class No. 3; and as it comes in after class No. 2, its true position would be class No. $2\frac{1}{2}$.

But as no enquiry as to the amount due to the several parties from John E. Schley under the decree of April 27, 1876, has ever been made and could not have been properly made under the former reference to the commissioner, as the court had decided they were not liens, it would be proper, before a sale of said property is made, to have an enquiry made as to the amount still due from Schley under the decree of April 27, 1876; and though the various sums decreed against Schley in favor of various parties do not bear interest on the face of the decree, yet interest must be calculated on all of them from August 1, 1876; for our law provides that "every judgment or decree for the payment of money, except where it is otherwise provided by law, shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not." (Code of W. Va. ch. 131, § 18.) The circuit court

ought therefore to have sustained the exception filed to the report of the commissioner in this cause, so far as it complained of the act of the commissioner in refusing to audit as liens the various sums decreed against John E. Schley as general receiver by this decree of April 27, 1866, but ought to have overruled it, so far as it decreed, that they should have been audited in class No. 2, and should have decided, that they were entitled to be audited as liens immediately after class No. 2 and before class No. 3; and it should have confirmed the commissioner's report in all other respects. Of course it ought not to have ordered a sale of the land of John E. Schley, as the amount due under the decree of April 27, 1876, must be first ascertained, which should be done by a reference to a commissioner for that purpose.

The sale of the defendant John E. Schley's land should not be delayed to ascertain, to whom each of the sums decreed to be paid by him by this decree of April 27, 1876, is now coming, it will suffice to ascertain the amount now due from him under this decree including interest on the various sums from August 1, 1876. The court should after the sale of the defendant Schley's land make such provision for the payment of the amount due under this decree of April 27, 1876, to the parties then entitled to it, as it shall deem proper.

I am therefore of opinion, that the decree of the circuit court of Jefferson county dated June 10, 1885, should be set aside, revoked and annulled, and the appellants should recover of the appellees their costs in this Court expended, and this cause should be remanded to the circuit court of Jefferson county to be further proceeded with according to the principles laid down in this opinion and further according to the principles governing courts of equity.

JOHNSON, PRESIDENT:

I concur in the opinion and syllabus with the following explanation: I have no doubt of the constitutionality of secs. 1 and 2 of ch. 139 of the Code, as it is of course understood, that no judgment or decree could be entered under said sections without due process of law. The officers of the court, before such an order to pay money, which is to have the force

of a judgment, is entered, must be before the court and have an opportunity to be heard.    We must presume, that the court had Schley before it, when he was ordered to pay over the money.    This is a collateral proceeding to enforce that order in the former case as a judgment against Schley; and if the court in some way did not have jurisdiction to enter such order against Schley, it should have been made to appear in this suit.    It not so appearing, we presume the court had jurisdiction to enter the order and under the statute to give it the force of a personal judgment against him.

This explanation I deem proper, because some of the language used by Judge Green is, as I think, liable to be misunderstood.    This I understand was the opinion of my brethren who concurred in the opinion.

REVERSED.    REMANDED.